IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

ENTERPRISE CITY BOARD )
OF EDUCATION, )
 )
  Plaintiff, )
 )
 v. ) Case No. 1:19-cv-748-ALB
 )
S.S. and J.S., *individually and as* )
*parents, legal guardians, next* )
*friends, and legal representatives* )
*of* S.S., *a minor,* )
 )
  Defendants. )

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Enterprise City Board of Education has petitioned the Court to review a Hearing Officer's decision under the Individuals with Disabilities Education Act. Following a due process hearing, the Hearing Officer granted Defendant S.S.'s petition, brought through his parents, alleging that the Board failed to provide him a free appropriate public education during the 2017–2018 and 2018–2019 school years. The Board appealed, and the parties filed cross-motions for judgment on the administrative record. (Docs. 56, 58). After reviewing the record, receiving briefing, and with the benefit of oral argument, the Court GRANTS the parents' motion and DENIES the Board's motion.

## BACKGROUND

S.S. is a student under the Board's supervision who has attended Coppinville Junior High School since he was twelve years old. He has been diagnosed with autism, pica, cerebral palsy, and Chiari malformation, which cause him to attack and bite people, pull their shirts and hair, walk in repetitive circles, and eat fibers off the carpet. He also punches himself in the face and engages in repetitive hand flapping. Because he attempts to run away, he wears an electronic monitoring bracelet. S.S. is indisputably eligible for special education services under the IDEA.

Before attending school in the Enterprise City School District, S.S. lived in Florida's Escambia County School District. To comply with IDEA requirements, S.S.'s school in Escambia County, Florida prepared him an individualized education program ("IEP"), which included a behavior intervention plan to document and address S.S.'s behavioral challenges. These plans enabled S.S. to make academic progress such as identifying his name from a list, walk with a teacher without running away, identify the weather, and perform a counting exercise. (Docs. 49-1 at 9; 49-7; 49-15 at 12–13).

This progress faltered when S.S. and his family moved to Alabama and he began attending school in the Enterprise City School District. S.S. first attended Hillcrest Elementary School in 2017–2018 and then Coppinville Junior High School in 2018–2019. During both school years, S.S. had an IEP. The IEPs mandated

evaluation for each of S.S.'s goals through both data collection and teacher observation. Yet S.S. did not master a single one of the goals or benchmarks for either school year.

The 2017–2018 IEP included goals in reading, math, science, behavior, language arts, and communication (Doc. 49-9 at 198–203). The IEP noted that S.S. could "sit and attend to activities for 5-10 minutes" with maximum prompts or redirection. (Doc. 49-9 at 215). His Measurable Annual Goal for behavior was, by the end of the school year, to remain in his seat or work area for 15 minutes with visual supports and minimum prompts 4 out of 5 times over a two-week period. (Doc. 49-9 at 215). His benchmarks in meeting this goal were to remain in his seat for 5 minutes with visual supports and minimum prompts 2 out of 5 times by the middle of the school year and for 10 minutes with visual supports and minimum prompts 3 out of 5 times by the middle of the second semester (Doc. 49-9 at 215).

The 2018–2019 IEP included goals in reading, math, functional communication, behavior/communication, and personal management. The IEP noted that S.S.'s behavior/communication challenges included deficits in communication skills that "limit interactions with others and adversely affects participation and performance during academic and social activities." (Doc 49-10 at 6). His Measurable Annual Goal was to "reduce elopement by making an exchange for the bathroom and to request desired objects with a gestural prompt in 4 out of 5

opportunities." (Doc. 49-10 at 6). His benchmarks were to "make an exchange for the bathroom and desired objects with a full physical prompt in 4 out of 5 opportunities" by the middle of the school year and to make those exchanges "with a partial physical prompt in 4 out of 5 opportunities" by the middle of the second semester. (Doc 49-10 at 6).

Regarding S.S.'s personal management, the IEP noted that S.S. was "behind and functioning below grade level in all academic and social areas." (Doc. 49-10 at 8). His Measurable Annual Goal for personal management was to transition throughout the day, given visual supports, "with a calm and safe body, keeping his hands within his own personal space with minimal verbal or gestural cues in 4 out of 5 opportunities." (Doc. 49-10 at 8). There were no benchmarks for this goal.

The IEPs for both school years mandated the creation of Annual Goal Progress reports to be sent every nine weeks to his parents. (Docs. 49-9 at 211; 49-10 at 2). And both IEPs noted that S.S. has "behavior which impedes his learning or the learning of others . . . ." (Docs. 49-9 at 197; 49-10 at 2). Neither IEP included a behavior intervention plan. (Docs. 49-9 at 197; 49-10 at 2). S.S.'s teacher, Bianca Ortiz, specifically promised the parents that the IEP team would develop a behavior

intervention plan for the child. But the Board never followed through on actually creating the promised plan.[1]

The parents sought a due process hearing shortly after S.S.'s teacher, Ortiz, had to leave Coppinville Junior High School to fill in for another teacher's medical emergency. About this same time, S.S. and his family moved from their home in Coffee County to a home within the Enterprise city limits. At the hearing, the parents requested that the Board use a board-certified behavior analyst to develop and implement a behavior intervention plan based upon peer reviewed research. The parents further sought to obtain a one-on-one aide for S.S. with additional professionals trained in behavior management as well as weekly counselling, accurate communication logs, a check-in and check-out system, and an organizational system. (Doc. 49-15 at 7). In the alternative, at the hearing, the parents identified a residential treatment center that might meet S.S.'s needs. (Doc. 49-15 at 11, 19).

During the hearing, the following additional facts were developed:

The Enterprise school district kept logs of S.S.'s behavior that differed slightly from the copies sent home to S.S.'s parents. Two of S.S.'s teachers testified that no

---

[1] Although the Board did not provide a formal plan to address S.S.'s behavioral challenges, the Board did try to meet S.S.'s needs in other ways, including customizing a classroom at Coppinville Junior High School with bathing and washing facilities and special mats. The Board also limited his class size to only three or four students, with additional opportunities for socialization and peer engagement through physical education, choir, and Special Olympics.

one documented the behavior strategies or techniques used with S.S. And the school district's Special Education Director, Joylee Cain, testified that she could not point to any document produced by the school board to show that S.S. made progress during the 2017–2018 or 2018–2019 school years.

During the 2018–2019 school year, S.S. had an aide named Zane Mitchell, but Mitchell was unaware of the circumstances and unprepared for the challenges of working with S.S. His requests for assistance went unanswered, and he resigned.

S.S.'s behavioral challenges extended to his transportation by bus to and from school, and he was suspended from the bus in September 2018. The Board neither provided him a behavior intervention plan to get him back on the bus nor reimbursed his parents for mileage when they began transporting S.S. The bus situation was reportedly addressed in an October 25, 2018 IEP meeting, but no written documentation of that meeting has surfaced.

At the hearing's conclusion, the Hearing Officer made these rulings:

1. The Board's failure to provide S.S. a behavior intervention plan during the 2017–2018 and 2018–2019 school years deprived him of a free appropriate public education;

2. The Board committed a procedural violation of the IDEA by failing to provide S.S. a behavior intervention plan for the 2017–2018 and 2018–2019 school years;

3. The Board committed a procedural violation of the IDEA by failing to provide S.S. both a behavior intervention plan for the bus and bus transportation for S.S. between September 2018 and February 2019;

4. The Board is directed to reimburse S.S.'s parents at the U.S. Federal mileage rate for their mileage incurred transporting S.S. to school between September 2018 and February 2019.

5. The Board committed a procedural violation of the IDEA by failing to document the IEP team's decision concerning the proposal to develop, revise, or discuss a behavior intervention plan for S.S.;

6. The Board is directed immediately to provide S.S. with a behavior intervention plan and a board-certified behavior analyst and to work with his team to address these concerns;

7. The Board is directed immediately to provide S.S. a one-on-one behavioral aide and a counselor; and,

8. The private residential placement is denied because it is not the least restrictive environment and S.S.'s unique needs can be met in the public schools.

Now the Board seeks review and reversal of the Hearing Officer's decision.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

In the administrative proceeding below, the Hearing Officer held that three of the Board's procedural violations harmed S.S.: failing to create behavior

intervention plans for the 2017–2018 and 2018–2019 school years, including for the bus; failing to provide S.S. bus transportation between September 2018 and February 2019; and failing to document the IEP team's decision whether to develop, revise, or discuss a behavior intervention plan.

The parents ask the Court to adopt the Hearing Officer's findings of fact and affirm her conclusions of law. The parents also request their attorney's fees. The Board responds that the Hearing Officer misconstrued the IDEA and misapplied controlling precedent because the law does not require provision of a behavior intervention plan, board-certified behavior analyst, behavioral aide, or counselor. The Board also argues that the Hearing Officer's evidentiary findings are faulty because S.S. has made appropriate and noteworthy, albeit minimal, gains under his IEPs, when viewed in light of his abilities. In essence, the Board argues that, although its goals may be meager, it is doing its best, given the circumstances.

After extensively reviewing the record, the Court holds that the Board was required by law to do better—even in light of S.S.'s unique circumstances. People tend to rise or sink to meet expectations; the IDEA reflects Congress's attempt to ensure those expectations remain high. *See Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 206 (1982) (compliance with IDEA procedures "would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP"). The Board, however, did not abide by the IDEA's

procedures, the IEP was not reasonably calculated to enable S.S. to receive educational benefits, and the violations deprived S.S. of a free appropriate public education. The Court also holds that the Hearing Officer's remedy was appropriate and that the parents are entitled to their attorney's fees.

### A. Legal standard.

The IDEA allows parents and local educational agencies to seek review of an IEP in an impartial due process hearing. 20 U.S.C. § 1415(f)(1)(A). After the hearing, either party can appeal the hearing officer's decision to a district court, where the court receives the administrative record, hears additional evidence, and grants appropriate relief based on the preponderance of the evidence. 20 U.S.C. § 1415(i)(2)(A), (C). The party challenging the IEP bears the burden of showing the program was deficient. *M.M. ex rel. C.M. v. Sch. Bd. of Miami-Dade Cty*, 437 F.3d 1085, 1096 n.8 (11th Cir. 2006) (citing *Schaffer v. Weast*, 546 U.S. 49, 62 (2005)).

The court conducts a modified de novo review, deciding questions of law de novo and making its own factual findings based on the record. The court gives "due weight" to the hearing officer's conclusions, being "careful not to substitute its judgment for that of the state educational authorities …." *L.J. ex rel. N.N.J. v. Sch. Bd. of Broward Cty*, 927 F.3d 1203, 1210 (11th Cir. 2019) (citing *R.L. v. Miami-Dade Cty Sch. Bd.*, 757 F.3d 1173, 1178 (11th Cir. 2014)). But the court does not grant the hearing officer's findings "blind deference." *Id.* Although the court cannot

"substitute [its] own notions of sound educational policy for those of the school authorities which they review," the court can "fairly expect those authorities to be able to offer a cogent and responsive explanation for their decisions that shows the IEP is reasonably calculated to enable the child to make progress appropriate in light of his circumstances." *Endrew F. ex rel. Joseph F. v. Douglas Cty Sch. Dist. RE-1*, 137 S.Ct. 988, 1001–02 (2017).

In conducting its review, the court can employ both an ex ante and an ex post review of the IEP: "A child's actual educational progress (or lack thereof) can be evidence of the materiality of [a failure in the IEP]—but it is not dispositive." *L.J.*, 927 F.3d at 1214 (citing *Endrew F.*, 137 S.Ct. at 998) ("*Rowley* 'involved a child whose progress plainly demonstrated that her IEP was designed to deliver more than adequate educational benefits'"). The IDEA, however, "cannot and does not promise 'any particular [educational] outcome.' No law could do that—for any child." *Endrew F.*, 137 S.Ct. at 998 (citation omitted).

To comply with the IDEA, states must provide a free appropriate public education. Parents can challenge a plan's content, either on procedural or substantive grounds, or they can challenge the plan's implementation. For a parent to succeed on a procedural content challenge, the parent must show that the school violated the IDEA's procedures and that the violation caused substantive harm. *L.M.P. ex rel. E.P. v. Sch. Bd. of Broward Cty*, 879 F.3d 1274, 1278 (11th Cir. 2018). The court

proceeds by asking two questions under *Rowley*, one procedural and the other substantive: "First, has the State complied with the procedures set forth in the Act? And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits?" *Id.* (quoting *Rowley*, 458 U.S. at 206–07). The state must meet both *Rowley* prongs to comply with the IDEA. *Id.*

### B. The Board violated IDEA procedures.

Beginning under the first prong of *Rowley*, the Court holds that the Board has committed multiple procedural violations of the IDEA. *L.M.P.*, 879 F.3d at 1278. These violations ranged from minor—slight discrepancies between copies of S.S.'s behavior logs—to severe. Here, the Board failed to consider behavior intervention in the classroom and on the bus, failed to provide S.S.'s parents with written notice of whether to change S.S.'s educational placement, and failed to follow the IDEA's procedural steps to temporarily remove S.S. from the bus. *See* 20 U.S.C. § 1415(b)(1) (parents must have an opportunity to examine all records relating to their child and "to participate in meetings with respect to the identification, evaluation, and educational placement of the child …."); 20 U.S.C. § 1415(b)(3) (parents must be provided written notice of any proposed change or refusal to change child's identification, evaluation, or educational placement); 20 U.S.C. § 1415(k) (if child's behavior requires temporary removal from placement, local education agency must

determine whether behavior was manifestation of child's disability; if it was a manifestation, local education agency must provide functional behavior assessment and behavior intervention plan); 34 C.F.R. § 300.324(a)(2)(i) (IEP teams must consider behavior intervention as part of forming a proper IEP). But, under the second prong of *Rowley*, only those procedural violations causing substantive harm will entitle a plaintiff to relief. *See L.M.P.*, 879 F.3d at 1278.

### C. The IEP substantively violated the IDEA.

Under the second *Rowley* prong, the Court holds that S.S.'s 2017–18 and 2018–19 IEPs were not reasonably calculated to enable him to receive educational benefits. IEPs must be reasonably calculated to enable a child to make progress "appropriate in light of his circumstances." *Endrew F.*, 137 S.Ct. at 995–96, 999. For a disabled student in a normal classroom setting, appropriate progress would mean "achiev[ing] passing marks and advanc[ing] from grade to grade. *Id.* at 1000 (quoting *Rowley*, 458 U.S. at 204). For a student unable to remain in a normal classroom setting, the "educational program must be appropriately ambitious in light of his circumstances, just as advancement from grade to grade is appropriately ambitious for most children in the regular classroom." *Id.*

"The goals may differ, but every child should have the chance to meet challenging objectives." *Id.*; *Endrew F. ex rel. Joseph F. v. Douglas Cty Sch. Dist. RE 1*, 290 F. Supp. 3d 1175, 1184 (D. Colo. 2018) (mere "updates" or "minor or

slight increases" in goals are insufficient). These "challenging objectives" are "markedly more demanding" than a mere de minimis test; otherwise, the child's "education" would be no more than "sitting idly . . . awaiting the time when they were old enough to drop out." *Endrew F.*, 137 S.Ct. at 1001 (quoting *Rowley*, 458 U.S. at 179) (internal quotation marks omitted). On the other extreme, a free appropriate public education's "challenging objectives" need not "provide a child with a disability opportunities to achieve academic success, attain self-sufficiency, and contribute to society that are substantially equal to the opportunities afforded children without disabilities." *Id.*

Here, the Court finds that any plan that does not address S.S.'s behavioral challenges cannot be reasonably calculated to enable him to receive educational benefits. S.S.'s behaviors were and are a severe impediment to his education. The record shows that S.S.'s behavior escalated to the point that his aide resigned after the aide's pleas for assistance went unheeded. Both the Hearing Officer and the Court were able to observe S.S. in-person during live proceedings, and the Court joins the Hearing Officer in noting that it is readily apparent that S.S. needs behavior intervention to make any progress at all.

The Board argues as a bright line rule that the IDEA does not "require administration of a Functional Behavioral Assessment ('FBA') or implementation of a Behavior Intervention Plan ('BIP') unless the [local education agency] seeks to

impose discipline for a violation of its disciplinary rules." (Doc 59 at 18). This argument fails for two reasons.

First, the argument fails as a matter of fact. As noted above, the Board disciplined S.S. by removing him from the bus based on his behavior and did not develop a behavior intervention plan. At oral argument, the Board argued its action was only an interim measure and not actually disciplinary in nature. But the Court is at a loss to describe as anything other than disciplinary the removal of a child from a bus after exhibiting problematic behavior.

Second, as a legal matter, the Board's argument misconstrues the IDEA. It is true, as the Board notes, that regulations promulgated under the IDEA expressly mandate the development of a behavior intervention plan only in certain circumstances, such as when discipline is imposed. *See, e.g.*, *Lessard v. Wilton Lyndeborough Coop. Sch. Dist.*, 518 F.3d 18, 25 (1st Cir. 2008) ("The IDEA only requires a behavioral plan when certain disciplinary actions are taken against a disabled child."). Therefore, an IEP does not always require a BIP to be substantively adequate, even for a child with severe behavioral challenges. *See, e.g.*, *Park Hill Sch. Dist. v. Dass*, 655 F.3d 762, 766 (8th Cir. 2011) ("The IDEA only *requires* that an IEP include … a 'behavioral intervention plan' in limited circumstances not present in this case."); *Alex R. ex rel. Beth R. v. Forrestville Valley Cmty. Unit Sch. Dist. #221*, 375 F.3d 603, 614 (7th Cir. 2004); *Pottsgrove Sch. Dist. v. D.H.*, 2018 WL

4368154, at *5 (E.D. Pa. 2018) ("An FBA is an option, but it is not inexorably a hard-and-fast requirement."). But it is blackletter law that, when a child's behavior impacts his ability to meet educational goals, a proper IEP should include a plan to address those behaviors. *Endrew F.*, 290 F. Supp. 3d at 1185 (noting that school district's "inability to develop a formal plan or properly address" child's disruptive behaviors impacts assessment under Supreme Court's *Endrew F.* standard).

Under the IDEA, the IEP team is required to consider behavior interventions and strategies to address behavior that "impedes the child's learning or that of others." 34 C.F.R. § 300.324(a)(2)(i). Specific programs or strategies, however, are not mandated as long as the educational organization takes appropriate steps to address a student's behavior. *See M.W. ex rel. S.W. v. New York City Dep't of Educ.*, 725 F.3d 131, 140 (2d Cir. 2013) (holding that absence of functional behavioral assessment "does not render an IEP legally inadequate under the IDEA so long as the IEP adequately identifies a student's behavioral impediments and implements strategies to address that behavior"); *C.T. v. Croton-Harmon Union Free Sch. Dist.*, 812 F. Supp. 2d 420, 431 (S.D.N.Y. 2011) (noting that IEP was not procedurally defective for failing to include functional behavior assessment because IEP did include "numerous strategies" to address student's behavior). In other words, "[t]he adequacy of a given IEP turns on the unique circumstances of the child for whom it was created." *Endrew F.*, 137 S.Ct. at 1001.

Here, the 2017–2018 and 2018–2019 IEPs were not reasonably calculated to enable S.S. to make appropriate progress in light of his circumstances. The Court agrees with the parents that one of the most pressing impediments to S.S.'s academic progress is his behavior. The IEP team is required to consider behavior interventions and strategies, but the record does not reflect that such considerations were ever made, let alone incorporated into the IEPs—despite the Board's own acknowledgment that S.S.'s behavior impeded his and others' learning. The Board's failure to address S.S.'s behavioral obstacles undermines the Board's contention that the IEPs were reasonably calculated to enable him to make progress appropriate in light of his circumstances. *Endrew F.*, 290 F. Supp. 3d at 1184.

The unique facts in S.S.'s case establish that, even though a behavior intervention plan is not always required, an IEP for S.S. that did not include a behavior intervention plan or its functional equivalent could not be substantively adequate. *Endrew F.* requires that the Board articulate some idea of how to address S.S.'s behavior. But the evidence shows S.S. was provided essentially the same plan year after year with neither measurable improvement nor a concrete plan to change his trajectory. The Board's failure to address S.S.'s behavior is especially glaring because the Escambia County School District in Florida had a behavior intervention

plan in place for S.S.,[2] S.S.'s aide repeatedly expressed his concerns that S.S.'s behaviors were not being properly addressed, and S.S.'s teacher said she was going to develop a behavior intervention plan but no plan or its equivalent materialized. The Board's failure to address S.S.'s behavior shows that his IEP was not reasonably calculated to enable him to make appropriate progress in light of his circumstances. *See Endrew F.*, 290 F. Supp. 3d at 1184.

In conducting its review, the Court's ability to measure S.S.'s progress has been hindered by the Board's failure to document any behavior interventions or activities, as mandated by S.S.'s IEP. But other evidence plainly establishes that the Board's failure to develop and implement a behavior intervention plan has caused S.S. to either regress or only make minimal progress since attending Coppinville Junior High School. The parents testified that S.S.'s behavior grew increasingly worse over his first two years at Coppinville Junior High School, and the record supports the parents' observation that S.S.'s aptitude and behavior have regressed since leaving the Escambia County School District in Florida. This evidence cuts against the argument that S.S. could just have been reacting negatively to a change in his environment. In any event, the Court concludes that S.S. and his parents have

---

[2] Although the record does not show that S.S. had a behavior intervention plan in place for his entire time in the Escambia County School District, the record does show that the Escambia County School District considered one. The same cannot be said for the Enterprise City School District at the time this lawsuit was commenced. Since initiation of this lawsuit, the Enterprise City School District's approach has improved, as evidenced by the current 2019–20 IEP.

met their burden to prove the IEP was not reasonably calculated to enable S.S.'s progress, even considering his unique circumstances.

Education is an inherently aspirational endeavor. It is an investment in our children and their future. The IDEA "gives force to a congressional determination that all children—including those who suffer from disabilities—are entitled to participate in the life of this country's public schools." *L.J.*, 927 F.3d at 1210. Accordingly, the IEP team's goal is to see students not as they are, but as they can become. The Board did not meet its obligations under the IDEA and, accordingly, failed to provide S.S. a free appropriate public education.

### D. The Hearing Officer's remedy is appropriate.

The Hearing Officer directed the Board to provide S.S. a board-certified behavior analyst, behavior intervention plan, behavioral aide, a counselor, and reimbursement for transportation mileage between September 2018 and February 2019. The Board argues that awarding a board-certified behavior analyst, functional behavior assessment, and behavior intervention plan exceeded the Hearing Officer's authority under the IDEA.

The IDEA grants the court "broad discretion" to award "such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(c)(iii)); *Draper v. Atlanta Indep. Sch. Sys.*, 518 F.3d 1275, 1284 (11th Cir. 2008) (quoting *Sch. Comm. of Town of Burlington v. Dep't of Educ. of Mass.*, 471 U.S. 359, 369 (1985)). The court's

award should place the child in the position he would have enjoyed but for the violation of the IDEA. *Draper*, 518 F.3d at 1289. This relief must be "appropriate" in light of the IDEA's purpose: providing a free appropriate public education to children with disabilities. The court's authority extends at least as far as issuing injunctive relief directing school officials to develop and implement an appropriate plan. *Town of Burlington*, 471 U.S. at 370. The court's decision is properly guided by equitable principles, and the court is in no way limited by the remedy fashioned by the hearing officer. *Draper*, 518 F.3d at 1286–87 (affirming district court's award of "supplemental services" beyond private school daily classes).

The parents had argued, with the support of some of those working at the school, that S.S. should be educated at a residential facility for some period. The Hearing Officer disagreed and found that, although S.S.'s behavior issues were serious, he needed "intervention, not isolation." (Doc. 49-15 at 38). Instead, the Hearing Officer ordered the Board to involve a board-certified behavior analyst to update the IEP and use a functional behavior assessment and behavior intervention plan. The parents did not appeal this portion of the Hearing Officer's order.

In arguing that this remedy exceeded the Hearing Officer's authority, the Board confuses its violations of the IDEA with the measures taken to remedy those violations. To remedy the Board's violations, the Hearing Officer appropriately used her broad discretionary powers under the IDEA to grant the relief she deemed

appropriate, including a board-certified behavior analyst, functional behavior assessment, and behavior intervention plan. In doing so, she attempted to restore S.S. to the position he would have enjoyed but for the violations. The IDEA does not substantively require these specific tools in every situation, and the Court is not ruling against the Board for not providing these tools. The Court will, however, issue the same remedy as the Hearing Officer to ameliorate the Board's violations of the IDEA. This remedy is strong medicine. And had the Board complied with its duties under the IDEA, such strong medicine might not have been necessary. As the saying goes, an ounce of prevention is worth a pound of cure.

### E. S.S. is entitled to attorney's fees.

The parents argue that, as the prevailing parties, they are entitled to their attorney's fees. The Board responds that the parents are not prevailing parties because the Hearing Officer did not award them a residential placement and instead awarded them a board-certified behavior analyst, behavior intervention plan, behavioral aide, a counselor, and mileage reimbursement. Accordingly, the Board argues that the parents are not entitled to their attorney's fees.

The IDEA permits the court to award reasonable attorney's fees to the "prevailing party." 20 U.S.C. § 1415(i)(3)(B). A plaintiff is a prevailing party if the relief obtained "materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff."

*Grinsted ex rel. Grinsted v. Houston Cty Sch. Dist.*, 826 F. Supp. 482, 485 (M.D. Ga. 1993) (quoting *Farrar v. Hobby*, 506 U.S. 103, 111–12 (1992)); *see also L.C. ex rel. B.C. v. Tuscaloosa Cty Bd. of Educ.*, 2016 WL 1573269, at *7 (N.D. Ala. Apr. 19, 2016) (quoting *Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598, 604 (2001) (finding no material alteration of legal relationship where remedy against Board was merely additional training for staff)).

The Hearing Officer's remedy factors into the Court's prevailing party analysis under the IDEA only to the extent it shows that the legal relationship between S.S. and the Board was materially altered. As a result of the Hearing Officer's order, affirmed by this Court, the Board must provide S.S. with transportation expenses, a functional behavior assessment, a behavior intervention plan, a board-certified behavior analyst, and an aide and counselor. These legal duties exist because of this litigation, and the parents are prevailing parties under the IDEA.

The Court agrees with the Hearing Officer's observation: "S.S. has a devoted and caring group of educators who seem to desire to help him succe[ed], and enviable parents that are devoted to him. His classroom environment is extremely adaptive to his needs and with changes, he can thrive there." (Doc. 49-15 at 39). Indeed, S.S.'s 2019–2020 IEP, which was created after S.S. brought this challenge

before the hearing officer, shows that the parties can work together to create a plan responsive to S.S.'s needs. The Court trusts that they will be able to continue working together to meet their shared educational goal of providing S.S. a challenging education adapted to his needs and abilities.

## CONCLUSION

The Hearing Officer's decision is **AFFIRMED**, the parents' motion for judgment on the administrative record, (Doc. 56), is **GRANTED,** and the Board's motion for judgment on the administrative record, (Doc. 58), is **DENIED**. Judgment will be entered in favor of S.S. in a separate document.

**DONE** and **ORDERED** this 12th day of June 2020.

_____/s/ Andrew L. Brasher_____
ANDREW L. BRASHER
UNITED STATES DISTRICT JUDGE